UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO: 4:07CV-105-M

BILLY JOSEPH FRENCH                                                    PLAINTIFF

v.

DAVIESS COUNTY, KENTUCKY, et al                          DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court upon motions for summary judgment by the defendants Daviess County, Kentucky ("Daviess County") and David Osborne ("Osborne") in his individual and official capacities [DN 78], Carol Byrd, ARNP ("Byrd") [DN 75], and William Scott Chapman, M.D. ("Chapman") [DN 74].  Also before the Court is a motion by the plaintiff, Billy Joseph French ("French"), for a hearing [DN 90].  Fully briefed, these motions are ripe for decision.

I.  SUMMARY JUDGMENT STANDARD

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical

doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 586 (1986). The Rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard that the Court reviews the following facts.

## II. BACKGROUND

The facts of this case are relatively straightforward rendering a hearing unnecessary. On May 5, 2007, French was incarcerated at the Daviess County Detention Center upon being charged with driving under the influence. (French Dep. 75:25-76:7, Nov. 10, 2008.) At the time of his incarceration, French contends that he was taking narcotic medications to treat various ailments. Specifically, French testified that he was taking narcotic Xanax to treat anxiety and narcotic Lorcet to treat chronic pain caused by five prior back surgeries. (Id. 30:18-21.) On his inmate medical form, completed at the time of incarceration, French indicated that he was taking these medications and that his "girlfriend will bring either a list of meds or bring the meds to the facility tomorrow (5/6/07)." (DN 84, Ex. 10.) The inmate medical form did not list the reasons French was taking these medications. (Id.) On May 6, 2007, a nurse at the jail, Nurse Bartlett, placed French on a Valium detoxification protocol pursuant to a verbal order by Chapman. (DN 84, Ex. 4 at 1.) Because there is no testimony in the record from Nurse Bartlett, it is unclear as to the circumstances under which French was placed on this protocol. French relies upon the testimony of another nurse at the jail, Nurse Isom, to speculate as to the reason French was placed on this protocol. She testified that an inmate would be placed on a detoxification protocol if an inmate could establish that

he had been prescribed Xanax or if the inmate was showing signs and symptoms of withdrawal from Xanax. (Isom Dep. 83:18-84:17, Jan. 16, 2008.) Xanax is a highly addictive narcotic medication which can cause serious withdrawal symptoms if the medication is discontinued abruptly. (Troost Dep. 16:24-17:8, Nov. 11, 2008.) These withdrawal symptoms can include seizures and symptoms of delirium which can go on for days or even weeks. (Allen Dep. 13:4-21, Feb. 17, 2009.)

The same day that French was placed on a Valium detoxification protocol he suffered a suspected seizure and was taken to a local emergency room. (Troost Dep. 13:5-8.) After being returned to the jail, he had another suspected seizure on May 7 and was treated by Dr. Neil Troost in the emergency room. French informed Dr. Troost that the jail was not prescribing Lorcet and Xanax for him. (Id. 22:1-3.) When Dr. Troost released French back into the jail's custody, he did not prescribe any pain medications and ordered the jail to continue administering the detoxification protocol. (Id. 17:5-8; 28:10-16.) According to French, he suffered no less than seven seizures between May 6 and May 8 each requiring him to be transported to the emergency room. French contends that, although he had been prescribed Xanax and Lorcet by his primary care physician, the jail never provided these narcotic medicines to French during his eight-month incarceration.

French initially brought this action pursuant to 42 U.S.C. § 1983 on behalf of himself and others similarly situated and against Daviess County and Osborne alleging that Osborne enacted and administered a policy or custom of "no narcotics" at the Daviess County Detention Center. He alleged that a "no narcotics" policy violates the 8th and 14th Amendments to the United States Constitution because such a policy is deliberately indifferent to the serious medical needs of inmates at the jail. On April 25, 2008, French sought leave to file a second amended complaint to add Byrd and Chapman as party defendants. In his second amended complaint, French alleges that

policymaking authority for the jail was delegated to Byrd and Chapman. Byrd is alleged to have created or enforced a policy that prohibited jail personnel from dispensing narcotic pain medication despite a valid prescription. Similarly, Chapman is alleged to have created or enforced a policy that prohibited jail personnel from dispensing narcotic Xanax. Each of these policies or customs was alleged to have been deliberately indifferent to the serious medical needs of inmates at the jail. French alleges that he was injured by these unconstitutional policies or customs because he suffered from increased pain due to the lack of narcotic pain medication and suffered from withdrawal symptoms because he was taken off Xanax cold turkey. Leave to file the second amended complaint was granted on May 29. The second amended complaint was docketed and the summonses were issued on May 30.

### III. DISCUSSION

French brought claims against Daviess County, Osborne, Byrd and Chapman in their official capacities based upon policies or customs enacted or enforced during the time French was incarcerated at the jail. Daviess County contends that these claims should be dismissed because there is no evidence of an unconstitutional policy or custom or that such policy was not the "moving force" behind French's alleged injuries. French also makes similar allegations against Osborne, Byrd, and Chapman in their individual capacities. Osborne and Byrd contend that the claims against them should be dismissed because there is no evidence in the record to suggest that either of them made an unconstitutional policy or custom nor that either of them was deliberately indifferent to French's serious medical needs. Byrd and Chapman also contend that French's claims against them individually are barred by the applicable one-year statute of limitations. The Court will address these arguments in turn.

4

## A. STATUTE OF LIMITATIONS

There is no dispute that the applicable limitations period is one year.  The dispute between the parties concerns the date upon which the action against Byrd and Chapman was commenced. French does not dispute that his cause of action accrued on May 5, 2007 as argued by Byrd and Chapman.  This is the date upon which French entered the jail and was not provided Xanax or Lorcet.  It follows then, that to be timely filed, French was required to commence this action against Byrd and Chapman prior to May 5, 2008.  Therefore, the question is when this action was "commenced."  Was this action "commenced" on April 25, 2008 when French sought leave to file an amended complaint, or was this action not "commenced" until May 30, 2008, the date upon which the second amended complaint was docketed and the summonses issued?

### 1. Federal Claims

The Court must first determine if Kentucky or federal law controls when French's § 1983 action was commenced.  As this matter is sitting in federal court and French's § 1983 claim is a claim arising under the laws of the United States, it would appear that Fed. R. Civ. P. 3[1] controls the commencement of this action pursuant to Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) ("*Except in matters governed by the Federal Constitution or by Acts of Congress*, the law to be applied in any case is the law of the state.") (emphasis added).  However, in actions commenced under § 1983, the rule is not so clear because federal courts "borrow" the personal injury limitations period from the forum state.[2]  Wilson v. Garcia, 471 U.S. 261, 280 (1985).  In a typical diversity

---

[1]    Rule 3 provides that "[a] civil action is commenced by filing a complaint with the court."  Fed. R. Civ. P. 3.

[2]    An action is commenced under Kentucky law "on the date of the first summons or process issued in good faith from the court having jurisdiction of the cause of action."  KRS

action, where the Court applies the forum state's statute of limitations to state law claims, the Court also applies the forum state's laws to determine when the action is commenced for purposes of the statute of limitations.  Eades v. Clark Distrib. Co., 70 F.3d 441, 443 (6th Cir. 1995) (finding that Kentucky law determines when an action is commenced for claims arising under Kentucky law). This is so because a state law that determines when an action is commenced for purposes of the state's statute of limitations does not directly conflict with Fed. R. Civ. P. 3.  Id.  "'[I]n diversity actions Rule 3 governs the date from which various timing requirements of the Federal Rules begin to run, but does not affect state statutes of limitations.'"  Id. (quoting Walker v. Armco Steel Corp., 446 U.S. 740, 751 (1980)).  It does not necessarily follow, however, that in non-diversity actions where a federal law "borrows" a state's limitations period, that the federal law also borrows the state's law regarding commencement of actions.  "Only the length of the limitations period, and closely related questions of tolling and application, are to be governed by state law."  Wilson, 471 U.S. at 268 (footnote omitted).  The Supreme Court, although not addressing this specific issue, has recognized that federal courts have been "forced to grapple with questions such as whether federal or state law govern[s] when an action [is] 'commenced,' or when service of process ha[s] to be effectuated."  Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 379 (2004) (citing Sentry Corp. v. Harris, 802 F.2d 229 (7th Cir. 1986)).

Both parties contend that the Sixth Circuit also has not addressed this issue.  However, in Mohler v. Miller, 235 F.2d 153 (6th Cir. 1956), the Sixth Circuit directly addressed this question in the § 1983 context.  There, the plaintiff alleged that police officers arrested him and searched his home in violation of the Constitution.  Mohler, 235 F.2d at 154.  The plaintiff filed his complaint

413.250.

6

prior to the running of the limitations period, but the summons was not issued and lodged with the marshal for service until after the running of the statute of limitations.  Id. at 155.  The question before the Court, therefore, was whether the filing of the complaint in accordance with Fed. R. Civ. P. 3 tolled the limitations period.  Id.  The Court answered the question in the affirmative by looking to federal, not state law:

> While state law controls the time within which an action must be begun, the manner in which an action is commenced and when it is deemed to have begun, are governed by the law of the forum.  These matters are procedural and not substantive.

Id. (citing Bomar v. Keyes, 162 F.2d 136, 140 (2d Cir. 1947) (for § 1983 claims, "we now hold that it is the filing of the complaint which tolls the statute.")).  Although Mohler is a pre-Wilson and Walker decision, the Sixth Circuit has continued to adhere to its reasoning in post-Wilson and Walker cases.  See, e.g., Macon v. ITT Cont'l Baking Co., 779 F.2d 1166, 1172 (6th Cir. 1985) ("Therefore, even if a state statute of limitations is borrowed and that state's rules also provide that service, not filing, tolls the statute of limitations, the prevailing rule among the federal courts of appeals is that Rule 3 of the Federal Rules of Civil Procedure governs the time of commencement of the action in cases where a federal matter or cause of action is involved.") (internal quotation and markings omitted).  This position is consistent with at least five other Circuits that have addressed the issue.  E.g., Sain v. City of Bend, 309 F.3d 1134 (9th Cir. 2002); McIntosh v. Antonino, 71 F.3d 29 (1st Cir. 1995); Moore v. State of Indiana, 999 F.2d 1125 (7th Cir. 1993); Lewis v. Richmond City Police Dep't, 947 F.2d 733 (4th Cir. 1991); Martin v. Demma, 831 F.2d 69 (5th Cir. 1987).

The only issue that remains then, is whether under federal law, French's § 1983 claim against Byrd and Chapman commenced upon seeking leave to file a second amended complaint.  Under facts similar to those here, the Sixth Circuit considered whether equitable tolling should permit an

otherwise time-barred claim. <u>Hughes v. Region VII Area Agency on Aging</u>, 542 F.3d 169, 187-88 (6th Cir. 2008). In <u>Hughes</u>, a § 1983 plaintiff sought leave to amend her complaint to add an additional cause of action prior to the running of the limitations period. <u>Id.</u> at 188. The motion was denied without prejudice on procedural grounds, but was later granted after the running of the limitations period. <u>Id.</u> The Sixth Circuit considered a list of five factors to determine whether equitable tolling applied: "(1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim." <u>Id.</u> at 187 (quotation omitted). "'These five factors are not comprehensive, nor is each factor relevant in all cases.'" <u>Id.</u> at 187-88 (quoting <u>Solomon v. United States</u>, 467 F.3d 928, 933 (6th Cir. 2006)). Applying some but not all of these factors, the Sixth Circuit found that there would be no prejudice to the defendants because they had notice of the additional allegations when the plaintiff sought leave to amend her complaint. <u>Id.</u> at 188-89. The Sixth Circuit also found that the plaintiff was diligent in pursuing her rights by attempting to amend her complaint within the limitations period. <u>Id.</u> at 189. The Sixth Circuit concluded that the day on which the plaintiff sought leave to amend her complaint was the day upon which her new cause of action timely commenced. <u>Id.</u>

Although Byrd and Chapman, unlike the defendants in <u>Hughes</u>, did not have notice of the claims against them until after the limitations period had run, the Court finds, after carefully considering the <u>Hughes</u> factors, that equitable tolling should nonetheless apply. The Court finds that Byrd and Chapman were not prejudiced by the Court's delay in granting leave to amend the complaint. Under federal law, a plaintiff generally has 120 days to serve a complaint upon a

defendant.  Fed. R. Civ. P. 4(m).  If a plaintiff files his complaint on the last day of the limitations period, the defendant may not have notice of the pending claims until the end of this 120-day "grace period."  Here, Byrd and Chapman were served well within 120 days from the end of the limitations period and therefore cannot contend that they were prejudiced by the delay in notice.  Furthermore, French displayed reasonable diligence in pursuing his rights as he "attempted to amend h[is] complaint within the limitations period."  Id.  Therefore, based on the doctrine of equitable tolling, French's § 1983 action was timely commenced upon his filing a motion for leave to amend his complaint to add Byrd and Chapman as defendants.

### 2. State Claims

Byrd and Chapman argue that French's state law claims are barred by the applicable statute of limitations.  Kentucky law provides that [a]n action shall be deemed to commence on the date of the first summons or process issued in good faith from the court having jurisdiction of the cause of action."  KRS 413.250.  The summonses against Byrd and Chapman were not issued until May 30, 2008, approximately 25 days after the running of the limitations period.  Apparently recognizing this defect, French argues that the Court should look to Fed. R. Civ. P. 3 to determine when this action was commenced.  French acknowledges that the Court would apply Kentucky's commencement rules if the basis of the Court's jurisdiction over his state law claims was diversity of citizenship.  French reasons, however, that Fed. R. Civ. P. 3 should apply because the basis of the Court's jurisdiction over the state law claims is not diversity of citizenship jurisdiction, but rather, supplemental jurisdiction.  Because his federal claims are timely, French contends that his state law claims should be deemed timely as well.

French's argument that the commencement of his state law claims is controlled by federal

law is unpersuasive.  Regardless of the basis of the Court's jurisdiction over a party's state law claims, the limitation of such claims is controlled by state law.  Ragan v. Merchs. Transfer & Warehouse Co., 337 U.S. at 530, 532 (1949).  This distinction was explored by the Seventh Circuit in Century Corp.  There, the plaintiffs brought federal securities fraud claims against the defendants and also asserted pendant state law securities claims.  Centry Corp., 802 F.2d at 230.  Because federal law did not provide a limitations period for the implied cause of action under Rule 10b-5, the limitations period was "borrowed" from the most analogous state statute.  Id. at 230-31.  The state law, however, provided that an action was not "commenced" for purposes of that statute until the defendant was served with a copy of the complaint.  Id. at 231.  The plaintiff filed the complaint with the federal district court prior to the running of the limitations period, but the defendant was not served with the complaint until after the running of the limitations period.  Id. at 230-31.  The Seventh Circuit concluded that the commencement of the federal securities claims was governed by federal law.  Id. at 245-46.  Pursuant to Rule 3, those claims were timely.  Id.  However, the Seventh Circuit held that the commencement of the pendent state law claims, subject to the same statute of limitations, was governed by state law and therefore untimely.  Id. at 246.  Similar results have been reached by other courts.  See U.S. ex rel Conner v. Salina Reg'l Health Ctr., 543 F.3d 1211, 1225 (10th Cir. 2008) (finding that the commencement of a supplemental state law claim was governed by state law); Pollock v. City of Astoria, No. CV06-845-AS, 2007 WL 54804, at *2 (D. Or. Jan. 4, 2007) (finding that a § 1983 claim was timely, but that a supplemental state law claim was untimely pursuant to the same limitations statute); Tillman v. Georgia, 466 F. Supp. 2d 1311, 1317 (S.D. Ga. 2006) (rejecting the same argument asserted by the plaintiff and applying state commencement rules to determine if supplemental jurisdiction claims were timely).  For these reasons, the commencement

of French's state law claims is governed by state law.  Whether French's state law claims are timely will therefore depend upon whether the statute of limitations is tolled under Kentucky law upon filing a motion for leave to amend the complaint.  The parties have not briefed this issue and it does not appear that Kentucky courts have answered this question.  The Court finds it appropriate to reserve ruling upon the state law claims until the Court determines whether the federal claims survive summary judgment.  If no federal claim survives, then the Court would likely decline to exercise jurisdiction over French's state law claims leaving it to Kentucky courts to determine whether the policies of the state warrant tolling of the limitations period under these circumstances.

## B. FEDERAL CLAIMS

French's federal claim for damages arises under 42 U.S.C. § 1983 which provides in part that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  French, who at pertinent times was a pretrial detainee, contends that the defendants violated his due process rights under the Fourteenth Amendment.  To state a claim under § 1983, a plaintiff must establish "both that 1) []he was deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law."  Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001) (citation omitted).  A pretrial detainee's constitutional rights are violated when a state actor is deliberately indifferent to the serious medical needs of the detainee.  Ford v. County of Grand Traverse, 535 F.3d 483, 494-95 (6th Cir. 2008).

### 1. Individual Capacity Claims

To establish that a prison official, in his individual capacity, was deliberately indifferent to

an inmate's serious medical needs, the plaintiff must establish two elements.  See Comstock v. McCrary, 273 F.3d 693, 702-03 (6th Cir. 2001).  The first element is an objective element, which requires a plaintiff to show that the inmate's medical needs were "sufficiently serious."  Id. (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  The second element is a subjective element, which is satisfied if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  "Complaints of malpractice or allegations of negligence are insufficient to entitle a plaintiff to relief."  Lewis v. McClennan, 7 F. App'x 373, 375 (6th Cir. 2001) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).  Furthermore, "[a] prisoner's difference of opinion regarding treatment does not rise to the level of an Eighth Amendment violation, . . . and, where the prisoner has received some medical attention and now disputes the adequacy of that treatment, the federal courts are reluctant to second-guess prison officials' medical judgments and to constitutionalize claims which sound in state tort law."  Id. (citing Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976)) (internal citation omitted).  However, "a prisoner who is needlessly allowed to suffer pain when relief is readily available does have a cause of action against those whose deliberate indifference is the cause of his suffering."  Westlake, 537 F.2d at 860.

Generally speaking, only those that are personally involved in the medical care of an inmate can be deliberately indifferent to the inmate's serious medical needs.  See, e.g., Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) ("liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'") (quoting Salehpour v. Univ. of Tenn., 159 F.3d 199, 206 (6th Cir. 1998)).  Under certain circumstances, however, one who directs others

to act in an unconstitutional manner or who supervises those who act in an unconstitutional manner can be held liable under § 1983 based on a theory of supervisory liability.  Miller v. Bock, 55 F. App'x 310, 311 (6th Cir. 2003).  "[S]imple awareness of employees' misconduct does not lead to supervisor liability." Leary v. Daeschner, 349 F.3d 888, 903 (6th Cir. 2003) (citation omitted).  Nor does the mere failure to intervene upon becoming aware of alleged deficiencies in medical treatment create liability under § 1983.  Davis v. Sapp, 21 F.3d 1268 (table), 2000 WL 572067, at *2 (6th Cir. 2000).  Instead, a supervisor can only be held responsible for the acts of a subordinate under § 1983 if the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  Hays v. Jefferson County, Ky., 668 F.2d 869, 874 (6th Cir. 1982) (citation omitted).

A plaintiff can establish the requisite authorization by showing that the supervisor enforced or adopted a plan or policy authorizing such conduct.  See id. at 873.  "When the plaintiff alleges supervisory liability . . . based on creation of a policy or custom, the plaintiff must show that . . . the policy or custom itself amounts to deliberate indifference on the part of the supervisory officials." Ronayne v. Ficano, 173 F.3d 856 (table), 1999 WL 183479, at *1 (6th Cir. 1999) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  This requires proof that the supervisor "disregarded a known or obvious consequence of his action."  Id. at *3.  In addition to establishing a policy that is deliberately indifferent, a plaintiff must also show "'[a]n affirmative link between the occurrence of the . . . misconduct and the adoption of any plan or policy-express or otherwise-showing [the supervisor's] authorization or approval of such misconduct.'"  Bock, 55 F. App'x at 311 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)); see also Miller v. Calhoun County, 408 F.3d 803, 815

13

(6th Cir. 2005) (the plaintiff must prove that the policies and practices "directly caused the constitutional violation.") (citation omitted).

### a. Byrd

<u>Direct Medical Care</u>

Byrd was a part-time medical health provider at the Daviess County Detention Center from December 28, 2006 until August 7, 2007.  (Carol Byrd Dep. 14:11-15, Aug. 22, 2008.)  She normally visited the jail once a week to treat inmates who filled out medical request forms.  (<u>Id.</u> 28:24-30:4.)  She testified that as far as she was aware, she never met French while he was incarcerated at the jail.  (<u>Id.</u> 38:8-12.)  She also testified that she never treated French for pain because, as far as she was aware, French never filled out a medical request form complaining that he was in pain.  (<u>Id.</u> 63:5-16.)  She testified that the only way that she would see an inmate to assess his condition is if the inmate put in a medical request to be seen.  (<u>Id.</u> 93:9-16.)  And the only way for an inmate to get a medication is to request it: "[i]f they never asked for it, then how would we know to order it?"  (<u>Id.</u> 93:22-25.)  The only direct involvement that Byrd had in the care of French appears to be various voice orders directing the nurses at the jail to administer various medications to French.  (DN 84, Ex. 4.)  Apparently French does not contend that Byrd's direct involvement in his care was deliberately indifferent.  As previously noted, jail officials can only be deliberately indifferent to the serious medical needs of an inmate if "the official knows of and disregards an excessive risk to inmate health or safety." <u>Farmer</u>, 511 U.S. at 837.  Here, the undisputed evidence establishes that Byrd did not know of the pain being suffered by French.  If Byrd was not aware of the risk to French's health, then she can not be deliberately indifferent to his medical needs.

14

Pain Medication Policy

Notwithstanding the lack of direct involvement that Byrd had in French's medical care, French contends that Byrd is nonetheless individually liable because of her alleged "policy, custom or practice that permitted nurses to blankety deny inmates narcotic pain medication and psychotropics lawfully prescribed by duly-licensed physicians."  (Pl.'s Resp. at 4.)  According to French, Byrd had a standing order prohibiting the nurses at the jail from administering narcotic pain medications.[3]  Lacking from the record, however, is any evidence that such a policy caused French to be denied his pain medication.  In Nurse Isom's deposition she was asked whether French ever complained of being in pain or whether he was ever denied any pain medication:

> Q.   Did Mr. French ever make any specific complaints to you about medical care or treatment or medications?
>
> A.   Not that I'm aware of.
>
> Q.   Did Mr. French ever – do you ever remember Mr. French specifically asking you for any type of medications or specific medications?
>
> A.   No, I don't remember.
>
> Q.   Do you remember Mr. French every complaining to you that he was in any type of pain?
>
> A.   I don't remember
>
> Q.   I know there are progress notes at the jail.  If a prisoner, such as Mr. French, would make specific complaints to you about a medical condition, would you record those complaints or your observations in progress notes?
>
> A.   Yes.

\*   \*   \*   \*   \*   \*

---

[3]    The Court assumes, for purposes of this Memorandum Opinion only, that Byrd in fact had such a policy.

> Q.    Do you remember at all having any medications for Mr. French that you
> refused to give him for any reason?
>
> A.    No, sir.

(Isom Dep. 15:23-16:14; 24:23-25:1, Nov. 11, 2008.)   There is nothing in the progress notes

submitted as part of the record, which reflect a request by French for any particular pain medication,

that French complained of being in pain, or that jail personnel ever denied him pain medication.

The jail also had a procedure whereby inmates could formally request medical assistance

using a medical request form.   French was asked whether he ever "wr[ote] down on any of these

medical request forms that you specifically needed pain medication, or Xanax medication . . . ."

(French Dep. 36:21-24.)   French responded that he "didn't write it on that form but they have it on

their record, their intake sheet, that that is what I take when I went in there."   (Id. 36:25-37:2.)

However, Nurse Isom testified that the only medication dropped off by French's family was his

blood pressure medication, and only after jail personnel called and requested that his family

members drop them off.   (Isom Dep. 29:22-30:3; 30:10-20.)   The record also reflects that jail

personnel contacted Dr. Rightmyer, French's physician.   Apparently, the only orders received from

Dr. Rightmyer were related to a blood-thinning condition suffered by French.   (Id. 30:21-31:5.)

When Nurse Isom was asked whether there were "any other references in the progress notes, either

for this day or for any subsequent day, where Dr. Rightmyer put in an order or put in information

on any other medications, other than [blood-thinning medication]," she responded, "No." (Id. 31:8-

13.)   French references a July 26, 2006, letter written by Dr. Rightmyer indicating that French

suffered from chronic back pain and that Lorcet was necessary to treat his pain.   (DN 84, Ex. 8.)

However, that letter was written almost a year before French's May 5, 2007, incarceration and there

is no evidence if and when that letter was placed in French's medical file at the jail or if any jail personnel was aware of the letter.  This letter is insufficient to put jail personnel on notice about French's medical condition as it existed in May 2007.

When French was admitted to the emergency room on May 7 due to suspected seizures, he complained that he was in pain and that jail personnel were not providing him with Lorcet or Xanax. (Troost Dep. 22:1-3.)  Dr. Troost, the emergency room doctor, performed a consultation and workup of French and reviewed the history of French's visits to the emergency room which showed a long history of drug and alcohol abuse.  (Id. 13:5-14:25.)  Dr. Troost also testified that if he thought it medically necessary, he could have prescribed narcotic pain medication to French:

> Q.     On any of those two visits that Mr. French made to your emergency room, if you felt it medically necessary, could you have prescribed narcotic pain medications to him, if you believed that the situation warranted it?
>
> A.     Yes.
>
> Q.     Does your record reflect that you did, in fact, prescribe any type of pain medications or narcotic pain medications to Mr. French when you saw him on those two occasions, on the – May the 7th and May the 8th of 2007?
>
> A.     I will triple check, but I did not.  I did not.

(Id. 28:4-16.)  Instead, Dr. Troost sent French back to the jail with orders for him to take Depakote–an anti-seizure medication–and to continue the Valium detoxification protocol.  (Id. 17-29:1.)  It appears that the jail followed these orders.  Byrd prescribed the Depakote as ordered on May 7, and, apparently because Chapman was not available, Byrd put in an additional voice order for Valium detoxification on May 9.  (DN 84, Ex. 4.)

Based on this evidence in the record, and when viewing the evidence in the light most favorable to the plaintiff, the Court finds that there is simply insufficient evidence to show that jail

personnel deprived French of a right secured by the Constitution, i.e. that any jail personnel was deliberately indifferent to French's serious medical needs or that their deliberate indifference was the result of the policy enacted or enforced by Byrd.  Although French indicated on his intake form that he was taking Lorcet and Xanax, there is no evidence that he ever told jail personnel the reason he needed that medication.   In addition, jail personnel apparently took steps to verify the medications he was taking.  During the term of his incarceration, jail personnel requested that French's family bring in any medication he was taking.  They even contacted French's doctor who was apparently aware of French's need for Lorcet and Xanax, but the doctor apparently never relayed that information to jail personnel.   Furthermore, there is no documentary evidence suggesting that French ever told jail personnel that he was in pain.   This is not a case, as suggested by French, where an inmate has been completely denied medical care.  Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  Nor is it a case where jail personnel "deliberately ignore[d] the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner." Hamilton v. Endell, 981 F.2d 1062, 1066 (9th Cir. 1992).  In situations "'[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law.'"  Estate of Graham v. County of Washtenaw, 358 F.3d 377, 385 (6th Cir. 2004) (quoting Westlake, 537 F.2d at 860 n.5).  Because French has failed to show an underlying constitutional violation, he also has failed to show an affirmative link between the occurrence of misconduct and the adoption of Byrd's policy.

18

<u>Xanax Policy</u>

French also argues that Byrd is liable under § 1983 because she had a policy to take inmates off of Xanax, an anti-anxiety medication, and put them on a Valium detoxification protocol. According to French, Nurse Bartlett failed to administer Xanax to French because of this policy, and as a result French suffered withdrawal symptoms including seizures and delirium.  As asserted against Byrd, this claim fails because there is no evidence that Nurse Bartlett carried out this procedure because of Byrd's "no-narcotics" policy.  Byrd, for example, testified that issues related to Xanax, a psychotropic medication, were the responsibility of the jail psychologist, Chapman. (Byrd Dep. 50:1-4.):

> Q.     All right.  Now Xanax isn't in there?
>
> A.     The psychiatric needs were seen by Dr. Chapman.
>
> Q.     Okay.
>
> A.     I did not see anyone for psychiatric medications.
>
> \*   \*   \*   \*   \*
>
> Q.     And what would happen if it was confirmed that they had been prescribed Xanax and were currently taking Xanax?
>
> A.     I'm not sure what Dr. Chapman would do with that.
>
> Q.     Okay.  That's just totally out of your field?
>
> A.     Right.
>
> \*   \*   \*   \*   \*
>
> Q.     So, if I'm understanding your testimony correctly, your understanding of the way things worked was if somebody came in on nar – psychotropic like Xanax, that was Chapman's –
>
> A.     Yes.

19

Q.      – bailiwick . . . .

(Id. 50:21-51:1; 53:13-19; 59:7-12.)  Nurse Isom also testified that the detoxification protocol was

pursuant to the orders of Chapman, not Byrd.  (Isom Dep. 83:6-11.)  The documentary evidence

verifies this testimony.  For example, Nurse Bartlett initially carried out the Valium detoxification

protocol pursuant to a voice order from Chapman.  (DN 84, Ex. 4.)  There is simply insufficient

evidence to establish that Byrd enacted a policy to place inmates that had been prescribed Xanax

onto a detoxification protocol.

        Even if French were able to establish that he was placed on a Valium detoxification protocol

pursuant to a policy enacted by Byrd, his claim would still fail because there is no evidence that such

a policy directs jail personnel to act in an unconstitutional manner or that the policy itself is

unconstitutional.  The record is bereft of any evidence from an expert opining that the circumstances

underlying French being placed on a Valium detoxification protocol was improper.  In fact, the

evidence tends to suggest otherwise.  Dr. Troost, for example, testified that Valium, the medicine

that is part of the jail's detoxification protocol, is equivalent to Xanax.  (Troost Dep. 22:1-3.)  He

also testified that the jail's detoxification protocol was appropriate and he wished that to continue.

(Id. 17:5-8.)  And although French correctly points out that Dr. Troost never testified that he agreed

with the initial decision to place French on the detoxification protocol, (id. 23:2-6,) neither did he

disagree nor order that the jail start administering Xanax to French.  Similarly, when French was

admitted to KCPC, a psychologist at the facility, Dr. Allen, indicated that he saw "no need for habit

forming sedatives such as Xanax in this individual . . . ."  (DN 87, Ex. 5.)  And although Dr. Allen

never testified that he agreed with the jail's course of treatment, neither did he testify that he

disagreed with it.  French's own experts have not concluded that a Valium detoxification protocol

is improper.  Although they have concluded that taking a patient off Xanax cold turkey would be improper because it could lead to withdrawal symptoms, at least one of French's experts testified that a better policy would be "for the local jails in Kentucky to taper off these medicines if a patient has been on them on a long-term basis to avoid unnecessary pain and suffering or life-threatening events." (DN 25, Ex.3.)  That appears to be what happened here.  According to Dr. Troost, Valium is the equivalent of Xanax.  (Troost Dep. 22:1-3.)  He also testified that the jail's detoxification protocol should have taken care of any withdrawal symptoms being suffered by French.  (Id. 20:18-25.)  Whether a Valium detoxification protocol is improper is "a factual question outside the lay understanding of jurors." Rigney v. Marcum, No. 06-187-REW, 2007 WL 2979931, at *10 (E.D. Ky. Oct. 11, 2007).  Under such circumstances, which extends to the § 1983 context, "the law requires expert testimony." Id. (citing Alberson v. Norris, 458 F.3d 762, 765-66 (8th Cir. 2006)).  Here there is none to establish that the jail's detoxification protocol was improper.  Because French has failed to show that the Valium detoxification protocol was unreasonable nor that Byrd disregarded a known or obvious consequence of enacting this protocol, Byrd could not have been deliberately indifferent even if she had enacted this policy.  This conclusion is consistent with other court's that have addressed jail detoxification protocols. See id. at *14; Burdette v. Butte County, 121 F. App'x 701, 702-03 (9th Cir. 2005) (finding that a decision to taper inmate of Xanax was not deliberately indifferent); Chatham v. Adcock, No. 3:05-CV-0127-JTC, 2007 WL 2904117, at **19-20 (N.D. Ga. Sept. 28, 2007); McNamara v. Lantz, No.3:06-CV-93 (PCD) , 2008 WL 4277790, at **13-14 (D. Conn. Sept. 16, 2008) (concluding that a jail's methadone detoxification program was not unconstitutional).  The decision to place French on a Valium detoxification protocol appears at most to be a disagreement over the proper course of medical treatment.  Such allegations are

21

insufficient to state a claim under § 1983.  In so concluding, the Court makes no opinion as to whether, under other circumstances, a plaintiff could establish that a Valium detoxification protocol is unconstitutional.  Based on the facts of this case, however, there is insufficient evidence to establish that the protocol, as applied to French, was unconstitutional and therefore summary judgment is warranted.

### b. *Osborne*

Osborne is not liable in his individual or supervisory capacity for similar reasons. Specifically, French has failed to show an underlying constitutional deprivation as it relates both to his treatment for pain and the Valium detoxification protocol.  Even if there were an underlying constitutional deprivation, French has failed to show how Osborne, in his individual capacity, is responsible for that deprivation where there is no evidence that he created or enforced these alleged policies or that he knowingly acquiesced in the enforcement of the policies.  In his deposition, Osborne was asked:

> Q.  Let me back you up.  You said something there that I didn't quite understand. You would agree with the no narcotics policy or you couldn't?
>
> A.  No.  I meant if a doctor established an absolutely no narcotic policy, I would expect to be consulted first and him to ask me if I did or did not approve.
>
> Q.  Have you ever been consulted on something like that?
>
> A.  I have never had a doctor come to me and say, can we be all non-narcotic, no.
>
> Q.  Have you ever had any nurses in the jail come to you or indicate to you that they were operating pursuant to what they understood to be a no narcotics policy?
>
> A.  No.  All the nurses were very clear that narcotics were acceptable if they were absolutely required.

(Osborne Dep. 26:19-27:12, Mar. 20, 2008.)  Osborne also testified that he leaves the details of

22

treatment "pretty much to the nursing staff and to the doctor at the jail." (Id. 30:7-10.) He testified

that "I'm aware of what is suppose to take place, but as far as doing the job, obviously with 700

inmates there's no way in the world I could go back there and personally do it.  I do leave it to

them." (Id. 30:10-13.)  Osborne's testimony is consistent with the testimony of current and prior

medical professionals at the jail.  For example, Dr. Byrd, who was the jail's doctor from 2003 to

2006, was asked about whether the jail directed him to deny narcotic medicines to inmates:

> Q.    Your practice with regard to narcotics was already, before you started with
> the jail, it was already in writing and was at the jail; is that correct?
>
> A.    I don't know.  I don't know if it was in writing or not.  In other words, the
> protocols that I saw made no mention of how you would treat certain
> conditions.  As far as I know, there was no policy pertaining to or that would
> state no narcotics in the jail.
>
> Q.    There was no policy of that nature that you're aware of?
>
> A.    None that I was aware of.
>
> Q.    Am I correct then that in terms of how the jail would deal with narcotics
> within inmates, that was your decision and your choice?
>
> A.    For the patients I saw, yes, sir.

(Dr. Byrd Dep. 11:14-12:5.)  Defendant Byrd likewise testified that Osborne never told her about

any jail policies, procedures, customs, or practices.  (Carol Byrd Dep. 24:22-24.)  Additionally,

Chapman testified:

> Q.    Have you ever heard anybody say that inmates were not supposed to get
> narcotic medication in the jail?
>
> A.    No.
>
> Q.    Did you ever have any discussions with Jailer Osborne or any other member
> of the jail staff as to what medications you could or could not prescribe to
> inmates?

A.    No.

Q.    They left that totally to you?

A.    Yes.

(Chapman Dep. 13:1-11.)  French has failed to present any evidence to the contrary.

Here, there is no evidence that Osborne "participated either directly or indirectly in the particular decision" that allegedly caused a constitutional injury to French.  To impose liability on Osborne under such circumstances would be to do so "solely by virtue of his supervisor status, which is not permitted under § 1983."  Turner v. City of Taylor, 412 F.3d 629, 646 (6th Cir. 2005) (citing Bellamy v. Bradley, 721 F.2d 416, 421 (6th Cir. 1984)).  It appears that Osborne delegated medical decisions to medical professionals.  In the Sixth Circuit, at least, "[s]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care." Ronayne v. Ficano, 173 F.3d 856 (table), 1999 WL 183479, at *3 (6th Cir. 1999); Graham v. County of Washtenaw, 358 F.3d 377, 385 (6th Cir. 2004).  Therefore, summary judgment in favor of Osborne, in his individual capacity, is appropriate.

### 2.  Municipal and Official Capacity Claims

French has also brought § 1983 claim against Daviess County and against Osborne, Byrd, and Chapman in their official capacities.  A § 1983 claim against a local government official in his or her official capacity is actually a claim against the local government itself.  Matthews v. Jones, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing Will v. Mich. Dept. of State Police, 491 U.S. 58, 68 (1989).  Therefore, the Court will treat each of these official capacity claims as claims against Daviess County.  To determine whether a municipality is liable for a § 1983 violation, the Court must analyze two distinct issues: "(1) whether plaintiff's harm was caused by a constitutional

24

violation, and (2) if so, whether the city is responsible for that violation." <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115, 120 (1992) (citation omitted).  Under § 1983, a municipality is not vicariously liable for the unconstitutional acts of its agents.  <u>Id.</u> at 122.  Nor can a municipality be liable if an employee applies an otherwise constitutional custom or policy in an unconstitutional manner.  <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 387 (1989).  Instead, a municipality can only be "liable when it can be fairly said that the city itself is the wrongdoer."  <u>Id.</u>  Only when the injury inflicted is caused by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," will a municipal entity be considered a wrongdoer under § 1983.  <u>Monell v. Dept. of Soc. Servs.</u>, 436 U.S. 658, 694 (1978).

French's claim against Daviess County fails because, as discussed above, French has failed to show that a state actor violated French's constitutional rights.  Unless there is an underlying constitutional deprivation, a municipality cannot be liable even if it has a policy of deliberate indifference.  <u>See Claybrook v. Birchwell</u>, 199 F.3d 350, 361 (6th Cir. 2000) (unless a state actor inflicts a constitutional deprivation upon the plaintiff, a municipality cannot be liable even if a county policy authorized unconstitutional conduct) (quoting <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) ("'If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of unconstitutionally excessive force is quite beside the point.'").  Furthermore, a municipality, pursuant to <u>Monell</u>, can only be liable if its policy or custom was the moving force behind a plaintiff's constitutional injury.  <u>Searcy v. City of Dayton</u>, 38 F.3d 282, 287 (6th Cir. 1994).  "'[T]o satisfy the Monell requirements a plaintiff must 'identify the policy, connect the policy to the city

itself and show that the particular injury was incurred *because of the execution of that policy*.'" Id. (emphasis added) (quoting Garner v. Memphis Police Dept., 8 F.3d 358, 364 (6th Cir. 1993)).  Here, French has failed to show that any jail personnel deprived French of narcotic pain medication *because of* an alleged no-narcotics policy.  Furthermore, French has failed to show that placing him on a Valium detoxification protocol was the result of deliberate indifference on the part of jail personnel.  Accordingly, summary judgment in favor of Daviess County is appropriate.

## IV. CONCLUSION

Chapman, in his individual capacity, has not moved for summary judgment on the merits of French's § 1983 claim against him.  Because the Court expects such a motion to follow, the Court will reserve ruling upon the defendants' motions for summary judgment as to French's state law claims until that time.   Accordingly, **IT IS HEREBY ORDERED** as follows:

1.      The motion by defendants, Daviess County, Kentucky and David Osborne in his individual and official capacities, for summary judgment [DN 78] is **GRANTED in part** and **RESERVED in part**.

2.      The motion by the defendant, Carol Byrd, ARNP, for summary judgment [DN 75] is **GRANTED in part** and **RESERVED in part**.

3.      The motion by the defendant, William Scott Chapman, M.D., for summary judgment [DN 74] is **DENIED in part** and **RESERVED in part**.

4.      The motion by the plaintiff, Billy Joseph French, for a hearing [DN 90] is **DENIED**.

cc:      Counsel of Record

26